UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 13-12652 -RGS

GREGORY CLEARY and JOHN DANIELE,
on behalf of themselves and all others similarly situated

v.

AMERICAN CAPITAL, LTD.

MEMORANDUM AND ORDER ON DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT

November 14, 2014

STEARNS, J.

The issue in this case is whether a private equity firm seeking to protect its shareholders' stake in a failing company succeeded in negotiating the delicate boundary between permissible self-help and *de facto* corporate control so as to avoid liability as a "single-employer" under the Worker Adjustment and Retraining Notification (WARN) Act of 1988, 29 U.S.C. §§ 2101-2109. Plaintiffs Gregory Cleary and John Daniele are former employees of Constar International, Inc. (Constar), a bankrupt electrical service contractor.[1] Cleary and Daniele were employed at a Constar facility in Norwood, Massachusetts. They were terminated on

---

[1] The claims of plaintiffs Rob Heindl, Jason McGee, Dennis Parrish, and Gordon Taylor were dismissed by this court on February 28, 2014. *See* Dkt. # 30.

October 31, 2007, when Constar's Board of Directors voted to terminate all Constar employees at the close of business so as "to avoid incurring further payroll for which there [were] no funds available to pay." Def.'s Mem. at Ex. 28 (Constar Board minutes, Oct. 31, 2007). Cleary and Daniele seek to represent a class of former employees of Constar who were similarly terminated. They are attempting, through this Complaint, to recover unpaid WARN Act wages and benefits from American Capital, Ltd. (American Capital), a publicly traded Delaware private equity fund that, at the time of the bankruptcy, owned the majority share of equity and debt in NewStarcom Holdings, Inc. (NewStarcom), Constar's corporate grandparent. On February 28, 2014, in an order denying in part American Capital's motion to dismiss, the court undertook to consider, as a threshold matter, whether American Capital's involvement in Constar was of a level sufficient to render it a single employer for WARN Act purposes. At plaintiffs' request, the court authorized discovery limited to this question. The issue now fully briefed, the court heard oral argument on American Capital's motion for summary judgment on October 24, 2014.

## BACKGROUND

Plaintiffs were employed as apprentice electricians by Constar, a commercial electrical contractor incorporated in Massachusetts in 1976.

Constar's parent company, NewStarcom, was organized under the laws of Delaware. NewStarcom was a shell corporation housing three operating companies: Constar, Matco Electric Corporation (Matco), and Port City Electric, Inc. (Port City). From November 1, 2006, through April 23, 2007, Constar was a wholly-owned subsidiary of NewStarcom. From April 23, 2007, through the employment terminations on October 31, 2007, Constar was a wholly-owned subsidiary of NSC Holdings (NSC), as were the other two subsidiary companies. All of NSC's common stock was owned by NewStarcom.

Defendant American Capital has a significant presence in the equity markets with over $5 billion invested in some 130 portfolio companies. In 2007, NewStarcom was one of those companies. American Capital owned 70% of NewStarcom's shares until October 1, 2007 (and 59% thereafter), as well as a majority of its debt (at one point in May of 2007, America Capital held approximately 95% of NewStarcom's subordinated secured debt).

In late 2006, NewStarcom began to incur substantial losses on the operations of its subsidiaries. In April of 2007, American Capital invested $14 million in NewStarcom (including the purchase of approximately $10 million of its preferred stock). The injection of cash was intended to alleviate NewStarcom's short-term liquidity problems and to bring its

vendor accounts current. The effort failed as NewStarcom's operating losses continued to compound. On June 4, 2007, NewStarcom's Chief Executive Officer Dennis Dugan was replaced by William Skibitsky.[2] Later (on August 21, 2007) Steven Cumbow replaced NewStarcom's Chief Financial Officer, John Kearney. By early October of 2007, American Capital had given up on the rescue effort, refusing to provide NewStarcom with a requested $6 to $7.8 million infusion of new capital. At the time that it made the decision to pull back on its investment, American Capital was aware that NewStarcom was in danger of being placed in default by Citizens Bank, its senior debt holder.

On October 11, 2007, NewStarcom's Board of Directors approved a last-ditch plan to save the company and its affiliates. The plan hinged on securing debt relief and refinancing from NewStarcom's key stakeholders, including Citizens Bank, CNA Surety, American Capital, and the largest of the vendor-creditors. The plan failed, when on October 30, 2007,

---

[2] The responsibility for Skibitsky's accession is disputed. The Board of Directors approval minute was signed by one board member, Gordon O'Brien, who was also an officer of American Capital. Based on O'Brien's signature and a declaration submitted by Dugan (the displaced CEO), plaintiffs argue that American Capital acted unilaterally in putting Skibitsky at the helm. *See* Pls.' Mem. at Ex. GG (Dugan Decl. ¶¶ 7-8). American Capital relies on the declaration of Steven Price, also a NewStarcom director and American Capital officer, who states that the decision was taken by the Board as a whole. *See* Def.'s Mem. at Ex. 2 (Price Decl. ¶ 35).

negotiations with Citizens Bank floundered and the Bank declared a default. On October 31, 2007, the Boards of Directors of NewStarcom and Constar met and voted to terminate all employees.

## DISCUSSION

Congress enacted the WARN Act in 1988 "in response to extensive worker dislocation that occurred in the 1970s and 1980s when employees lost their jobs, often without notice, as companies were merged, acquired or closed. The purpose of the WARN Act is to protect workers by obligating employers to give their employees advanced notice of plant closings." *In re APA Transp. Corp. Consol. Litig.*, 541 F. 3d 233, 239 (3rd Cir. 2008), citing *Hotel Employees and Rest. Employees Int'l Union Local 54 v. Elsinore Shore Assocs.*, 173 F.3d 175, 182 (3rd Cir. 1999). As explained in the attendant regulations, the WARN Act provides

> protection to workers, their families and communities by requiring employers to provide notification 60 calendar days in advance of plant closings and mass layoffs. Advance notice provides workers and their families some transition time to adjust to the prospective loss of employment, to seek and obtain alternative jobs and, if necessary, to enter skills retraining that will allow these workers to successfully compete in the job market.

20 C.F.R. § 639.1(a).

To implement these goals, the WARN Act provides that "[a]n employer shall not order a plant closing or mass layoff until the end of a 60-day period after the employer serves written notice of such an order . . . to each affected employee." 29 U.S.C. § 2102(a). If an employer fails to provide the required notice, it "shall be liable to each aggrieved employee for back pay and benefits for each day that the notice was not given." 29 U.S.C. § 2104(a).

The typical WARN Act case arises when a company decides for cost-saving or unionization reasons to close a plant and move its operations elsewhere. In those instances, the employer is aware of the impending move well before it occurs and is in a position to either give employees the required notice, or if it chooses otherwise, to pay the sixty days of a worker's lost wages and benefits. Bankruptcy is the atypical case. In the context of an impending bankruptcy, a WARN Act notice may hasten the collapse of the business by undermining management's best efforts to salvage it.[3] And, once a bankruptcy is declared, the company (or its remnants) passes to the control of the bankruptcy trustee, leaving workers

---

[3] Although not at issue for purposes of the instant motion, the WARN Act allows for exceptions to the notice requirement in the instance of either a "faltering business" or an "unforeseeable business circumstance." 29 U.S.C. §§ 2102(b)(1)-(2). If an exception is found to apply, the employer is only required to give "as much notice as is practicable." 20 C.F.R. § 639.9.

with no immediate recourse other than in a case like this one, where there may be a claim against a solvent affiliate of the bankrupt enterprise.

The WARN Act does not address the issue of when (or if) an affiliated entity can be deemed an alter-ego or "single employer" of the bankrupt company so as to lead to joint or successor liability for the failure to provide the 60-day notice. The WARN Act states only that it applies to any "business enterprise" that employs more than 100 employees. 29 U.S.C. § 2101(a)(1). A Department of Labor regulation attempts to give more specific guidance.

> Under existing legal rules, independent contractors and subsidiaries which are wholly or partially owned by a parent company are treated as separate employers or as a part of the parent or contracting company depending upon the degree of their independence from the parent. Some of the factors to be considered in making this determination are (i) common ownership, (ii) common directors and/or officers, (iii) de facto exercise of control, (iv) unity of personnel policies emanating from a common source, and (v) the dependency of operations.

20 C.F.R. § 639.3(a)(2). However, in a subsequent explanatory statement, the Department of Labor made clear that the WARN Act regulation was not intended to displace "existing law" governing the liabilities of related business entities. *See* 54 Fed. Reg. 16,045 (Apr. 20, 1989).

As a threshold matter, the court must determine which of three competing legal tests to apply in making the determination whether

American Capital is liable for Constar's failure to provide plaintiffs with the 60-day WARN Act notice.  Plaintiffs advocate for the Department of Labor (DOL) balancing test adopted by the Third, Fifth and Ninth Circuits.  *See Pearson v. Component Tech. Corp.*, 247 F.3d 471, 491 (3rd Cir. 2001); *Administaff Cos. v. New York Joint Bd., Shirt & Leisurewear Div.*, 337 F.3d 454, 457-458 (5th Cir. 2003); *Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers, Gen. Truck Drivers, Office Food & Warehouse Local 952 v. Am. Delivery Serv. Co.,* 50 F.3d 770, 775 (9th Cir. 1995).[4] American Capital, for its part, invokes two District Court cases from the First Circuit that meld three competing tests: (1) state corporate law (veil piercing);[5] (2) the "single employer" rule;[6] and (3) the DOL factors.  *See*

---

[4] A Second Circuit case cited by plaintiffs, *Coppola v. Bear Stearns & Co.*, 499 F.3d 144 (2d Cir. 2007), is not fully on point.  Although the Second Circuit referenced the DOL balancing test, it ultimately decided to follow the lead of the Eighth and Ninth Circuits in deferring to traditional principles of lender liability.  The "traditional" test asks "whether, at the time of the plant closing, the creditor was in fact 'responsible for operating the business as a going concern' rather than acting only to 'protect [its] security interest' and 'preserve the business asset for liquidation or sale.'" *Id*. at 148, quoting *Chauffeurs, Sales Drivers, Warehousemen & Helpers Union Local 572, Int'l Bhd. of Teamsters, AFL-CIO v. Weslock Corp.*, 66 F.3d 241, 244 (9th Cir. 1995), and citing *Adams v. Erwin Weller Co.*, 87 F.3d 269, 272 (8th Cir. 1996).  I will, however, draw on traditional lender liability principles in my application of the DOL balancing test.

[5] The Massachusetts veil-piercing theory focuses on common ownership, pervasive control, intermingling of business assets, thin capitalization, nonobservance of corporate formalities, absence of corporate

8

*Milan v. Centennial Commc'ns. Corp.*, 500 F. Supp. 2d 14, 26 (D.P.R. 2007) and *United Paperworkers Int'l Union, AFL-CIO, CLC, and United Paperworkers Int'l Union, AFL-CIO, CLC, Local 408 v. Alden Corrugated Container Corp.*, 901 F. Supp. 426, 437 (D. Mass. 1995).

Of the cases cited by the parties, Judge Becker's opinion in *Pearson* offers the greatest substance. In *Pearson*, employees of a defunct company sought to impose WARN Act liability on the major secured lender of their former employer. Judge Becker took measure of the difficulty courts have had in applying the DOL test, the factors of which "do not precisely correspond to any of the established tests for [determining when two

records, non-payment of dividends, insolvency at the time of the litigated transaction, the siphoning of corporation funds by dominant shareholders, nonfunctioning officers and directors, the use of the corporation for unilateral transactions benefitting dominant shareholders, and the use of the corporation as a vehicle for fraud. *Attorney Gen. v. M.C.K., Inc.,* 432 Mass. 546, 555 n.19 (2000).

[6] The First Circuit has applied four factors in determining whether two business entities constitute a single employer: "(1) interrelation of operations, (2) common management, (3) centralized control of labor relations and (4) common ownership." *Penntech Papers, Inc., v. NLRB*, 706 F. 2d 18 (1st Cir. 1983) citing *Radio & Television Broad. Union v. Broad. Service of Mobile, Inc.*, 380 U.S. 255 (1965). None of these factors is controlling and they do not all need to be present in order to find that there is a single employer. Ultimately the question "depends on 'all of the circumstances of the case' and is marked by an absence of an 'arm's length relationship found among unintegrated companies.'" *Id.* (citations omitted). *But see Romano v. U-Haul Int'l*, 233 F.3d 655, 666-667 (1st Cir. 2000) (holding "control of employment decisions" is "the most important" factor).

corporations compose a single entity]. Courts examining affiliated corporations under the WARN Act have often applied two or more tests, purporting to 'average' the results, usually without any systematic method for doing so." *Pearson*, 247 F.3d at 483. Judge Becker, however, persuasively argued that the application of multiple tests "obfuscates the purposes of the inquiry itself, i.e., whether the affiliated corporation *should* be legally responsible for issuing WARN notice." *Id.* at 489 (emphasis in original). He concluded that "the most prudent course is to employ the factors listed in the Department of Labor regulations themselves" as this approach allows for the greatest simplicity and uniformity in setting a standard for imposing WARN Act liability. *Id.* I am persuaded by Judge Becker and will follow his lead in applying the DOL balancing test.

In assembling the balancing test, the DOL sought to provide clarity, while at the same time not encroaching on firmly established principles of state corporate law. While the DOL test, the integrated or "single employer" test, and state corporate law may vary at the margins, none departs from the "general principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for

the acts of its subsidiaries." *United States v. Bestfoods*, 524 U.S. 51, 61 (1998) (internal quotation marks omitted).

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248 (1986) (emphases in original). A material fact is one which has the "potential to affect the outcome of the suit under applicable law." *Nereida-Gonzalez v. Tirado-Delgado*, 990 F.2d 701, 703 (1st Cir. 1993). In assessing the genuineness of a material dispute, the facts are to be "viewed in the light most flattering to the party opposing the motion". *Nat'l Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 735 (1st Cir. 1995).

Plaintiffs recognize that American Capital was not an equity holder, creditor, or manager of Constar. Rather, they argue a two-tier approach: (1) that NewStarcom and Constar were so closely integrated that they qualified as a single employer; and (2) that American Capital, as an equity

partner and creditor of NewStarcom, should be deemed a single employer with respect to both NewStarcom and Constar.

The first tier of plaintiffs' approach appears to have a solid foundation. NewStarcom owned all of NSC, which in turned owned all of Constar. NewStarcom and Constar shared a corporate headquarters. Meetings of the Boards of Directors of NewStarcom and Constar were held simultaneously and the individual directors were for the most part interchangeable. The president of Constar reported to both the Board of Directors of Constar and the CEO of NewStarcom. NewStarcom only had two employees, the CEO and CFO. All other employees were employed by one of the three operating subsidiaries (Constar, Port City and Matco). NewStarcom and its three operating subsidiaries filed their state and federal tax returns simultaneously and issued combined annual audited financial statements. In other words, none of the DOL factors appear untouched.

The second tier of plaintiffs' approach, however, is planted on shakier ground. American Capital and NewStarcom did not share offices, bank accounts, financial statements, tax returns, employment practices, hiring procedures, or office equipment and supplies. Rather, American Capital's alleged *de facto* control of NewStarcom is pinned by plaintiffs on the

apparent control it exercised as NewStarcom's largest shareholder (American Capital owned a majority of NewStarcom, which in turn owned NSC, which in turn owned Constar), as well as the work performed by the board members appointed by American Capital[7] (the first two of the DOL factors).[8]

That American Capital owned a majority of NewStarcom stock by itself merits little weight. It is a bedrock principle of corporate law that "the

---

[7] At all relevant times, a majority of both NewStarcom and Constar's Boards of Directors were officers of American Capital. American Capital makes the not altogether implausible argument that because none of the directors of NewStarcom or Constar served on American Capital's Board, it is a misnomer to refer to a "common" board of directors as described in the DOL test (similarly no officer of NewStarcom served as an officer of American Capital). *But see In re Las Colinas, Inc.*, 426 F.2d 1005, 1014 (1st Cir. 1970) ("We perceive no reasoned distinction between the interlocking director cases and those where the same individual serves one corporation as a director and another as an officer.").

[8] American Capital characterizes much of this work as having occurred pursuant to a Management Services Agreement (MSA). The MSA cuts both ways. On the one hand, (as American Capital argues) it can be seen as independent justification for the advice that American Capital offered to the management of NewStarcom and Constar on the companies' daily operations. On the other hand, the MSA can be viewed (as through plaintiffs' eyes) as a Trojan Horse inserted to give cover to American Capital's micro-management of the companies' internal affairs. Given the court's ultimate view that American Capital was within (if sailing close) to the boundary separating a concerned creditor-investor from a corporate alter-ego, it is unnecessary to decide whether the DOL factors should be expanded to include management consulting arrangements like this one as a common employer indicia.

corporation and its shareholders are distinct entities." *Dole Food Co. v. Patrickson*, 538 U.S. 468, 474 (2003). For this reason, "it is hornbook law that 'the exercise of the 'control' which stock ownership gives to stockholders . . . will not create liability beyond the assets of the subsidiary. That 'control' includes the election of directors, the making of by-laws . . . and the doing of all other acts incident to the legal status of stockholders.'" *United States v. Bestfoods*, 524 U.S. 51, 61-62 (1998).[9] While *de facto* exercise of control is one of the factors of the DOL test, it "is not intended to support liability based on a parent's exercise of control pursuant to the ordinary incidents of stock ownership." *Pearson*, 247 F. 3d at 503. As a majority shareholder, American Capital was entitled to exercise the emblems of control that ownership gives to stockholders, including the naming of members of the company's board of directors.

---

[9] For this reason, there is little to be taken from plaintiffs' citation of the corporate self-description offered by American Capital's CEO regarding the firm's general approach to its portfolio companies: "[I]f you really look at our assets, we look most like a diversified growth company, diversified holding companies. . . . We're very similar to Roper [a competitor], but we're probably more hands-on than Roper is, in terms of its subsidiaries. We don't call them subsidiary companies, right, as an investment company, we have to call it a portfolio company, but really they're operating subsidiaries of ours. We control them. As I showed, we have an operations team with 10 former Presidents and CEOs and they're constantly working in those companies to help grow them and develop them." Pls.' Mem. at Ex. Z (Transcript of American Capital's CEO Presents at J.P. Morgan SMid Cap Conference, Dec. 11, 2013). The CEO was articulating the difference between the typical angel investing and venture capital firm.

Plaintiffs concede as much, but argue that the directors appointed by American Capital to the NewStarcom and Constar boards took actions that exceeded the authority of a mere director, and on occasion took them without the participation of other members of their respective boards. For most of the time at issue, three American Capital appointees served on the boards of NewStarcom and Constar: Steve Price, Gordon O'Brien and Mark Fikse.[10] A fourth American Capital appointee, Craig Moore, joined both boards on October 11, 2007, just prior to the de facto termination of business. Plaintiffs focus principally on the events surrounding the removal and replacement of Dugan and Kearney with Skibitsky and Cumbow. Plaintiffs dwell at length on the fact that Dugan and Kearney had been recruited to their positions at NewStarcom by American Capital, although the relevance is not altogether clear as the descriptions of the involvements of Price and O'Brien in the hiring process seem well within the authority of a board member delegated to perform the task.[11]

---

[10] All three were also members of the American Capital operations team that "worked with portfolio companies, working on due diligence, advising . . . on the strategic directions of the companies, and was involved in the hiring of senior executives within those companies," as well as "coach[ing] those management teams of those portfolio companies in their endeavors." Pls.' Mem. at Ex. CC (Fikse Dep. 12-13).

[11] Dugan states in his declaration that, after being called by a head hunter, he was interviewed at American Capital's offices by, among others,

Plaintiffs turn more forcefully to the decision to replace Dugan and Kearney at NewStarcom, which they argue was initiated by Fikse (an American Capital appointee to NewStarcom's Board) without the participation of other directors. According to plaintiffs, Fikse signed a legal services agreement with the law firm of Sally & Fitch to represent NewStarcom in any unpleasantness resulting from the terminations. He also signed an engagement letter on behalf of NewStarcom with Advantage Partners, the head hunting firm that recruited Cumbow. In signing the letter, Fikse listed his title as "Principal" of NewStarcom. He also told Advantage Partners to bill American Capital for their services in order to keep Kearney in the dark about the search. When Skibitsky was hired, O'Brien alone signed the minute order accepting Dugan's resignation as CEO, as well as adopting the terms of his separation agreement and those of the employment agreement with Skibitsky.

---

O'Brien and Price, although he also met with Steve Bisson, a minority share holder and subordinated secured lender to NewStarcom. Pls.' Mem. at Ex. GG (Dugan Decl. ¶ 7). Similarly, Kearney states that, after being contacted by an employment search agency, he also interviewed with Price and later with O'Brien. Pls.' Mem. at Ex. FF (Kearney Decl. ¶¶ 4-6). Kearney relates being offered the position of Chief Financial Officer by then NewStarcom CEO Eli Florence who told him on his first day on the job that he was there "over my strong objections." *Id.* ¶¶ 6 & 8. Kearney also states that he renewed his employment agreement after his first year with Price. *Id.* ¶ 17.

American Capital responds that none of the acts alleged by plaintiffs to have been undertaken by Price, O'Brien, or Fikse, is inconsistent with the duties of a corporate director. American Capital also points to the declaration submitted by Cumbow attesting that, in his experience, while American Capital made occasional employment recommendations, the ultimate authority over hiring at NewStarcom resided at all times with management and the Board of Directors. Def.'s Mem. at Ex. 1 (Cumbow Decl. ¶¶ 24-25).

Plaintiffs nonetheless persist with the argument that the degree of control over NewStarcom exercised by Price, O'Brien, and Fikse rose to that of a *de facto* putsch. They point to Dugan's complaint that Fikse had effectively seized control of the company from him during his tenure, as well as an email exchange between Fikse and Skibitsky in which Skibitsky remonstrated: "I believe that I am responsible for Constar. . . . I think it is about time that you let me run with the situation. I warned you that we are starting to confuse the people. . . . [T]hey are questioning who is in charge, we both can't be. . . . [L]et me do my job." Pls.' Mem. at Ex. J (e-mail chain dated Aug. 28, 2007). (Curiously, this latter exchange directly contradicts plaintiffs' portrayal of Skibitsky as an abject tool of American Capital).

The law is not so foolish as to fashion a rule – even under the laudable auspices of the WARN Act – that would prevent an equity investor like American Capital from taking measures to protect or, if necessary, salvage its shareholders' stake in an investment going bad. As the Second Circuit, among others, has recognized, "a creditor may exercise very substantial control in an effort to stabilize a debtor and/or seek a buyer so as to recover some or all of its loan or security without incurring WARN liability." *Coppola*, 499 F.3d at 150. *See also Pearson*, 247 F. 3d at 503 (the *de facto* control factor does not "create liability for a lender's general oversight of its collateral."); *Adams*, 87 F.3d at 272 (a lender does not "become a WARN employer because it proposed methods to improve [the borrower's] profitability, suggested new management, and stepped up its verifications to keep track of [the borrower's] deteriorating financial condition. Major lenders do these sorts of things all the time."). Rather, "the dispositive question is whether a creditor is exercising control over the debtor beyond that necessary to recoup some or all of what is owed, and is operating the debtor as the *de facto* owner of an ongoing business . . . When the exercise of control goes beyond that reasonably related to such a purpose and amounts to the operation of the debtor as an ongoing business — such as

when there is no specific debt-protection scenario in mind — [then] WARN liability may be incurred." *Id.*

In this light, the actions undertaken by American Capital, however aggressive, were consistent with those of (an ultimately unsuccessful) attempt to protect its investment. These include proposing and assisting the recruitment of "new management," and the ferreting out of an accurate and complete understanding of the company books (I have in mind Allison Young Zabranksy's work to improve the weekly financial reporting). *See Adams*, 87 F.3d at 272 (a creditor may propose "methods to improve [the borrower's] profitability," and may step "up its verification to keep track of [the borrower's] deteriorating financial condition" without incurring WARN Act liability). While a WARN Act plaintiff should not be held to the nearly impossible burden of demonstrating a complete merger of identities between the defunct employer and its former equity owner, at a minimum a plaintiff must establish control by the later over the "the allegedly illegal employment practice that forms the basis for the litigation." *Pearson*, 247 F.3d at 491. Plaintiffs offer no material evidence that the decision of NewStarcom and Constar to terminate all employees and file for bankruptcy was made by American Capital, nor any plausible reason why American Capital, as an unsecured creditor, would have thought it in the

interest of its shareholders to do so. In this regard, at most plaintiffs unpersuasively quibble with aspects of the NewStarcom board minutes. For example, they dispute the recording of a vote to send termination notices to employees based on Dugan's (who was no longer employed at NewStarcom) recollection that votes were never taken at board meetings.[12]

Plaintiffs' final argument, based on the fifth of the DOL factors (operational dependency), is that NewStarcom's operating losses placed it in financial thrall to American Capital whose forbearance was essential to its survival. The argument confuses operational dependency with financial reality. While it is true that American Capital's refusal to inject more cash into NewStarcom's and Constar's operations was a precipitating factor in eventually forcing the companies into bankruptcy, the same could be said of Citizens Bank, and possibly others of the major creditors. It will be recalled that even after American Capital declined to supply further funding to NewStarcom, management embarked on an ultimately futile attempt to locate a white knight. As Judge Becker observed about a similar course of events in *Pearson*, the "negotiations with [the creditor company], and its

---

[12] This is disputed by Cumbow and Price, both of whom attended the Board meeting in question and who attest that an affirmative vote was taken with respect to the WARN Act notices. In any event, it is clear that, because plaintiffs have failed to adduce evidence demonstrating a "unity of personnel policies emanating from a common source," they fail to demonstrate the fourth of the DOL factors.

attempts to secure additional financing all reflect [the debtor company's] own vitality, and demonstrate that [the creditor company's] decision to cut off its funding was not a 'de facto exercise of control' over [the debtor company's] decision to close its doors." *Pearson,* 247 F.3d at 505. Moreover, here, as in *Pearson*, the persistent requests from NewStarcom to American Capital for relief "demonstrate that [the debtor company] was acting as an independent entity seeking further capital rather than as a branch of [the creditor company] operating under [the creditor company's] direction." *Id.*

At best, plaintiffs have shown that American Capital knew that its attempts to rescue NewStarcom and Constar had likely failed and that a bankruptcy filing was probably imminent. *See* Pls.' Mem. at Ex. M (Price e-mail of Oct. 1, 2007: "If we look at the business as a whole then yes we are about to lose Constar and the rest of it."). This knowledge does not, however, translate into an obligation on American Capital's part to warn employees of impending doom. Had American Capital taken that course, all it would likely have earned is a lawsuit even larger than this.

ORDER

For the foregoing reasons, American Capital's motion for summary judgment is <u>ALLOWED</u>.  The Clerk will enter judgment for the American Capital and close the case.

SO ORDERED.

<u>/s/ Richard G. Stearns</u>
UNITED STATES DISTRICT JUDGE